IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

ANGELA A. FYKE-McCRACKEN,      )
                               )
              Plaintiff,       )
                               )
      v.                       )   Case No. 09-0242-CV-W-REL-SSA
                               )
MICHAEL J. ASTRUE, Commissioner)
of Social Security,            )
                               )
              Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Angela Fyke-McCracken seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. and plaintiff's application for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. § 1381, et seq. Plaintiff argues that the ALJ (1) failed to perform a proper analysis of plaintiff's credibility; (2) failed to give proper weight to the opinions of plaintiff's treating psychiatrist; and (3) failed to properly consider plaintiff's alleged physical impairments at step two of the sequential evaluation. I find, based on the record, that the ALJ properly carried out her responsibilities in each of these three areas. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I.  BACKGROUND

This case involves two applications made under the Social

Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq., and the second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq (Tr. 98-103). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff's applications were denied (Tr. 43-46; 54-58). On June 17, 2008, following a hearing, an administrative law judge (ALJ) rendered a decision, in which she found that Plaintiff was not under a "disability" as defined in the Social Security Act (Tr. 9-22). On February 11, 2009, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales,

402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of

proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record includes the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing before the ALJ.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## 1. Earnings Statement

The plaintiff's earning statement reflects the following income for the years indicated:

```
1985 $   112.51
1986 $   592.06
1987 $ 2,240.00
1988 $ 1,638.87
1989 $ 1,960.82
1990 $ 2,166.88
1991 $ 5,352.29
1992 $ 2,697.37
1993 $ 1,913.32
1994 $ 1,833.85
```

```
1995 $   755.33
1996 $ 1,201.29
1997 $   415.17
1998 $ 1,780.78
1999 $ 9,016.81
2000 $12,080.46
2001 $ 6,841.34
2002 $   191.01
2003 $   379.45
2004     None
2005     None
2006 $    72.51
```

(Tr. 104).

## 2.  Medications and Side Effects

On August 12, 2007 (and updated on January 28, 2008), plaintiff reported her then-current medications and their side effects as follows:

```
Effexor        Hot flashes
Lexapro        Shakeness (sic)
Thorizine      Fatigue
Xanax          Not Applicable
Termazapam     Fatigue
Remeron        Fatigue
Ranitidine     Not applicable
Advair         Not applicable
Percocet       Fatigue
Risperdal      Mood swings
Minidine
Nortripdine
```

(Tr. 173-74).

### *B.  SUMMARY OF MEDICAL RECORDS*

On December 14, 2001, Parimal Purohit, M.D., plaintiff's psychiatrist, saw plaintiff for 15 minutes, and reported that plaintiff was having increased anxiety symptoms. Plaintiff was also using alcohol but trying to stay sober. She asked to have

6

Antabuse[1], which was prescribed. The doctor observed that plaintiff appeared anxious and depressed. She denied any suicidal or homicidal ideation, denied any auditory or visual hallucination. She appeared distracted (Tr. 755).

On January 18, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was tired, lacked motivation, and was anxious. Plaintiff was using alcohol and not taking her Antabuse. The doctor strongly encouraged plaintiff to have strict sobriety and use Antabuse, but plaintiff disagreed. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared depressed, anxious, and **"appear[ed] gaming too at times and demanding Clonazepam"** (Tr. 752).

On February 20 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having some difficulty with her medications. Plaintiff was planning to work although she reported one episode of anxiety while with her boyfriend. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, and denied any auditory or visual hallucination (Tr. 748-49).

On March 21, 2002, Dr. Purohit saw plaintiff for 15 minutes,

---

[1]Antabuse is a prescription drug used to help people who want to quit drinking. It causes a negative reaction if a person drinks while on Antabuse.

and reported that plaintiff was bored, felt empty, and had depression and anxiety symptoms. Her alcohol use continued although she reported being sober for a week and a half. **Plaintiff denied any side effects or problems with her medications.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared anxious and rather **manipulative** but redirectable (Tr. 745).

On April 18, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was about the same as her previous session. Her sleep and appetite were okay. **She was handling her daily routine okay.** Because plaintiff was gaining weight, the doctor recommended that she **diet and exercise.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared brighter on her affect (Tr. 741-42).

On May 30, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was gaining weight, which was being addressed by her physician. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared brighter (Tr. 738-39).

On July 10, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing well with sleep and appetite,**

**and feeling more energetic. The doctor encouraged plaintiff to work and have education and vocational rehabilitation involvement.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and stated her affect was brighter (Tr. 736).

On August 19, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was gaining weight and had one panic attack. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, and denied any auditory or visual hallucination (Tr. 733-34).

On September 16, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing better although she had some spells of nervousness and anxiety. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, and denied any auditory or visual hallucination, appeared slightly anxious (Tr. 730-31).

On October 16, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having body aches and sleep disturbances. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared mildly anxious but was pleasant, cooperative, and redirectable (Tr. 728-29).

On November 13, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing well except for some

sleeping problems.  The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared somewhat tired and blunted in affect but brightened up during the conversation(Tr. 726-27).

On December 12, 2002, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having some anxiety symptoms and depression relating to **situational problems** (moving away from home, financial problems).[2]  The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared brighter (Tr. 723-24).

On February 6, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having some **situational problems** involving the custody of her daughter and her ex-husband.  The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared brighter and less anxious during the conversation.  The doctor assessed **anxiety, situational in nature** (Tr. 720-21).

---

[2]Situational depression or anxiety is a short-term condition that occurs when a person is unable to cope with, or adjust to, a particular source of stress.  Unlike major depression, these adjustment disorders are brought on by an outside stress and usually go away once the person has adapted to the situation.

On April 3, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was not having any problems other than sleep disturbance and mind racing at night. **Plaintiff was working as a waitress and handling the duties relatively okay except for some anxiety symptoms.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared anxious but was redirectable (Tr. 714-15).

On May 1, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was not having any difficulties other than sleep problems. **Plaintiff was reportedly working as a waitress with problems relating to attention that she was handling well.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared brighter in her affect, was smiling appropriately, and had lost six pounds since her last visit (Tr. 712-13).

On May 29, 2003, Dr. Purohit saw plaintiff for 30 minutes, and reported that **plaintiff was off her medication because it had been stolen. The doctor reported some manipulation on plaintiff's part.** Plaintiff reported **no side effects to her medication.** She was encouraged to **diet and exercise.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination,

appeared to have a brighter affect, was pleasant and cooperative, and redirectable (Tr. 705-06).

On June 26, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff had a rebound of anxiety. The doctor reported that plaintiff had lost her job and was having financial problems. Plaintiff expressed the intention of going to school for pedicures and ultimately finding work in that field.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and that plaintiff's affect was congruent to her thought content. Plaintiff had lost six pounds (Tr. 701-02).

On August 21, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was about the same as her last visit except for anxiety related to financial difficulties. Plaintiff reported having no luck finding a job. The doctor encouraged plaintiff to seek vocational rehabilitation to find a job. The doctor called the anxiety situational. Plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, but appeared slightly blunted on her affect due to the situational problems** (Tr. 699-700).

On October 16, 2003, Dr. Purohit saw plaintiff for 30 minutes, and reported that **plaintiff was stressed based on an upcoming legal charge.** Plaintiff wrote bad checks and there was a possibility

that she would go to jail. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, but was distracted at times (Tr. 696-97).

On November 13, 2003, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was about the same as her last visit, except for some anxiety due to an upcoming court date. The doctor encouraged plaintiff to diet and exercise.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared situationally depressed but redirectable (Tr. 694-95).

On January 28, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was about the same as her last visit. **Plaintiff's sleep and appetite were good, but she was having some sleep disturbance due to a forgery charge.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared calm, cooperative, and redirectable (Tr. 690-91).

On March 26, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having difficulty with sleep. The doctor encouraged plaintiff to **diet and exercise.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual

hallucination, and stated plaintiff affect's was brighter that she was pleasant and cooperative (Tr. 686-87).

On May 10, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported she was having **no difficulty with her medication**. Plaintiff still had depressed symptoms but they were not as intense as before. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, and appeared mildly anxious (Tr. 682-83). Plaintiff was given a Global Assessment of Functioning (GAF) of 50-60 (Tr. 684).[3]

On September 1, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was about the same as her last visit. Plaintiff's sleep and appetite were good; she was having some difficulty with anxiety, depression and concentration. **Plaintiff reported that she had some court dates coming up and that was affecting her anxiety at times**. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared brighter in affect, pleasant, and was cooperative(Tr. 677-78).

---

[3]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

On September 1, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was not having significant difficulty. **Plaintiff's sleep and appetite were good and she was handling day-to-day situations well, although she was having spells of anxiety and depression secondary to the situational problem of having no job and the financial strain. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared depressed with appropriate affect, and her attention and concentration were less intact and plaintiff was distracted** (Tr. 674-75).

On November 5, 2004, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was not having significant difficulty except for situational anxiety and depression, which she was handling well.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, and denied any auditory or visual hallucination. Plaintiff appeared brighter on affect and was redirectable (Tr. 671-72).

On January 3, 2005, Dr. Purohit saw plaintiff for 15 minutes, and reported she was not having any significant difficulty. Plaintiff's sleep and appetite were fine. **Plaintiff was handling her day-to-day situations relatively well, although she was having some anxiety.** The doctor observed that plaintiff appeared alert

and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, her affect was brighter, and she was pleasant, cooperative and redirectable (Tr. 670).

On February 25, 2005, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well except for her six-month sentence for DWI. Plaintiff denied any side effects to her medication.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucination, appeared stressed but was handling it positively (Tr. 668).

On May 20, 2005, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing relatively well except for weight gain, which could have been caused by medication. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, and denied any auditory or visual hallucination. Plaintiff appeared to be sunburned and the doctor warned about exposure to the sun. The doctor was also reportedly looking into psychotic medications (Tr. 666).

On June 17, 2005, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well except for some sleep disturbance. Plaintiff reported symptoms of depression but said her handling of day-to-day situations was improving.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual

hallucination, and appeared mildly anxious.  Plaintiff was assessed with sleep disturbance (Tr. 665).

On July 20, 2005, plaintiff went to the North Kansas City Hospital complaining of rib pain.  The notes record that plaintiff had been a **smoker of 1½ packs for twenty years** (Tr. 458-61).

On July 27, 2005, plaintiff went to the North Kansas City Hospital for **right-side abdominal pain**.  She was given **Vicodin** (a narcotic pain reliever) and Tylenol, and was told to follow up with her treating doctor (Tr. 447-57).

On July 30, 2005, plaintiff went to the North Kansas City Hospital for abdominal pain.  She was given **Demerol** (a narcotic pain reliever), **morphine** (a narcotic pain reliever), and Vistaril (a sedative to treat anxiety).  She was instructed to take Vicodin as directed (Tr. 436-46).

On August 16, 2005, plaintiff went to the North Kansas City Hospital for **abdominal pain**.  She was instructed to keep an appointment for a colonoscopy and **diagnosed with non-specific abdominal pain** (Tr. 426-35).

On September 2, 2005, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing relatively well except for some sleep disturbance.  Plaintiff's weight was going down, and the doctor encouraged her to keep **dieting and exercising.** The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or

visual hallucination, appeared to have a brighter affect and was more redirectable. Plaintiff was assessed as improving (Tr. 662).

On October 15, 2005, plaintiff went to St. Luke's Northland Hospital complaining about an anxiety attack (Tr. 566-72).

On November 4, 2005, plaintiff was given a GAF of 45-50 by Dr. Purohit (Tr. 637).[4]

On December 29, 2005, plaintiff went to Encompass Medical Center complaining about stomach pain. She was given Nerium (heartburn drug) and **Vicodin** (acetaminophen and hydrocodone) (Tr. 229).

On January 12, 2006, plaintiff was given a GAF of 45-50 by Dr. Purohit (Tr. 636).[5]

On January 24, 2006, plaintiff went to Encompass Medical Center complaining about abdominal pain. The plan included seeking a gastrointestinal consult and providing plaintiff with **Vicodin**. She was also **told to stop smoking** (Tr. 228).

On February 18, 2006, plaintiff went to St. Luke's Northland

_____

[4]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[5]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Hospital complaining about **pain in the buttocks and groin**, resulting from a bump to her side four months earlier (Tr. 559-65). The social history shows plaintiff **smoking 1½ packs** of cigarettes (Tr. 560).

On March 17, 2006, plaintiff went to the North Kansas City Hospital for **tooth pain**. She was given **Vicodin** and told to see a dentist (Tr. 418-25).

On March 19, 2006, plaintiff went to St. Luke's Northland Hospital complaining about a **tooth ache** (Tr. 550-58). She was given **Dilaudid** (a narcotic) (Tr. 552) and discharged with **Vicodin** (Tr. 554).

On March 21, 2006, plaintiff went to Encompass Medical Center complaining about **tooth pain**. She had already been given **morphine** by the ER. Plaintiff was told to follow up with a dentist, and was given Amoxicillin and **Vicodin** (Tr. 227).

On April 14, 2006, plaintiff went to Encompass Medical Center complaining about **injuries she suffered in a bar fight**. She was told to use ice and was given **Vicodin** (Tr. 226).

On April 27, 2006, plaintiff went to Encompass Medical Center complaining about **asthma**. She was treated and told to **stop smoking** (Tr. 225).

On May 7, 2006, plaintiff went to St. Luke's Northland Hospital complaining about a **sore throat** (Tr. 543-49). The notes

show plaintiff was **smoking a pack a day, while suffering from asthma** (Tr. 544).

On May 8, 2006, plaintiff went to St. Luke's Northland Hospital complaining about a **sore throat** (Tr. 536-42). The notes relate that **"pt. pain out of prop to findings"** (Tr. 538).

On May 12, 2006, plaintiff went to Encompass Medical Center complaining about **asthma.** She was treated and told to **stop smoking** (Tr. 224).

On May 17, 2006, plaintiff went to Encompass Medical Center complaining about **chest pain.** She was treated and directed to **stop smoking and avoid second-hand smoke** (Tr. 223).

On May 21, 2006, plaintiff went to St. Luke's Northland Hospital complaining about a **cough** (Tr. 529-35). She was given prednisone and told to **stop smoking** (Tr. 531).

On June 21, 2006, plaintiff went to St. Luke's Northland Hospital complaining about **stomach pain** (Tr. 519-28). The notes show **plaintiff was "drug seeking"** (Tr. 521).

On June 22, 2006, plaintiff went to St. Luke's Northland Hospital complaining about throat pain (Tr. 512-18).

On June 28, 2006, plaintiff went to Encompass Medical Center complaining about **stomach problems** following an emergency room visit. **Her ER work up, including CT scans, were negative.** She was referred to a gastrointestinal specialist for an electroretinogram.

**Plaintiff was given Vicodin and the notes state, "no more narcotics"** (Tr. 222).

On July 3, 2006, plaintiff went to the North Kansas City Hospital for **injuries sustained when she fell down steps** (Tr. 404-07).

On July 4, 2006, plaintiff remained in the North Kansas City Hospital for pain in her chest, shoulder, back, and ribs. She reportedly **fell down the stairs** the night before and had been given ibuprofen for pain, which was not working. She was diagnosed with rib contusion and shoulder sprain, and was given **Vicodin** (acetaminophen-hydrocodone). She was given a sling, directed to **stop smoking**, and told to follow up with her treating doctor (Tr. 387-403).

On July 5, 2006, plaintiff went to Encompass Medical Center complaining about an injury she received when she fell in her house on July 1, 2006. Plaintiff had been to the ER and had been given a sling and eight Vicodin for pain. The doctor continued the sling, ordered range-of-motion exercises, and prescribed hydrocodone, Flexural (muscle relaxant), and Alee. Plaintiff was told to stop smoking (Tr. 221).

On July 12, 2006, plaintiff was seen at Encompass Medical Center complaining about **severe chest pain**. She reported fell down and developed severe pain. **An x-ray show three rib fractures**. Plaintiff was placed on **Vicodin** and instructed to stop smoking (Tr.

21

220).

On July 16, 2006, plaintiff went to the North Kansas City Hospital for **shortness of breath.** She was diagnosed with pneumonia and told to **stop smoking** (Tr. 373-85).

On July 17, 2006, plaintiff went to the North Kansas City Hospital for a follow-up visit dealing with **broken ribs.** She was treated, given **acetaminophen-oxycodone,** and told to follow up with her primary care doctor (Tr. 367-72).

On Jury 18, 2006, plaintiff was seen at Encompass Medical Group concerning **broken ribs and pneumonia.** The note indicates that plaintiff was still smoking. She was advised to **stop smoking** and avoid secondary smoke (Tr. 219).

On July 23, 2006, plaintiff went to the North Kansas City Hospital complaining about pain and was found to have three broken ribs. She was treated and released to follow up with her primary care doctor (Tr. 361-66).

On July 27, 2006, plaintiff went to Encompass Medical Group complaining about rib pain and was **counseled about her drug-seeking behavior.** The doctor wrote that **"she was going to ER repeatedly . . . to get narcotics don't feel comfortable writing them again."** The doctor also noted that **plaintiff was given a work excuse for three weeks while plaintiff was on job training noting that "she can't work with her fractured ribs"** (Tr. 218).

On July 30 2006, plaintiff went to Liberty Hospital complaining about chest pain. Plaintiff had multiple right rib fractures (Tr. 264-74).

On July 7, 2006, plaintiff went to St. Luke's Northland Hospital complaining about **chest and shoulder pain** resulting from a fall (Tr. 507-11). The notes relate that **plaintiff was taking Vicodin and "wants the 750's [because] they work better"** (Tr. 510).

On August 6, 2006, plaintiff went to Liberty Hospital complaining about **right chest pain**. Her heart size was normal, her lungs were clear, and no fluid was seen. **The impression was the pain could be caused by muscle spasm** (Tr. 256-63).

on August 14, 2006, Donald J. Clement, a consultant in gastroenterology, reported that plaintiff had **irritable bowel syndrome**. He recommended a pain management consultation (Tr. 235-38).

On August 17, 2006, plaintiff went to Encompass Medical Group complaining of pain in her ribs. The doctor wrote, **"She has been to the ER again with this pain and she wasn't given any pain med because I had called after finding out she was getting meds from numerous sources. I told her she needs to get any pain meds from me only and she needs to get very few"** (Tr. 217).

On September 24, 2006, plaintiff went to St. Luke's Northland Hospital complaining about a cough (Tr. 499-506). She was treated

with Prednisone (Tr. 504). Imaging showed subsegmental stelectasis or scarring in the left low lobe of plaintiff's lung (Tr. 506).

On October 2, 2006, plaintiff was seen at Encompass Medical Group concerning a **cough and an injury to her tail bone.** She was treated and given **Vicodin** with the notation that **she was to receive no more Vicodin "after this refill"** (Tr. 215).

On October 5, 2006, plaintiff was seen at Encompass Medical Group complaining of a shoulder injury and **seeking Vicodin,** which the physician did not prescribe observing that "**[plaintiff should] avoid the Vicodin as she is using it for too many reasons**" (Tr. 214).

On November 15, 2006, plaintiff was seen at Encompass Medical Group complaining of **wrist pain and anxiety over her testing positive for cocaine while on probation for DUI.** She was given a wrist splint, ibuprofen, and a drug screen (Tr. 304). This drug screen came back negative (Tr. 305).

On November 24, 2006, plaintiff went to Liberty Hospital complaining about **right shoulder pain resulting from a fall.** There was **no evidence of osseous process or evidence of dislocation; there were no soft tissue abnormalities** (Tr. 248-255; 318).

On November 30, 2006, Stephan Kunz, M.D., following **wrist imaging, found no arthritic change, no bony abnormalities, and no soft tissue abnormalities. His impression was listed as negative**

**as to plaintiff's wrist** (Tr. 314).

On November 30, 2006, Dr. Kunz, following chest imaging, found plaintiff's heart and vessels, lungs, bones, and soft tissue all to be normal (Tr. 312).

On December 18, 2006, plaintiff was seen at Encompass Medical Group complaining of chest pain, stomach pain, and low back pain. The plan included a cardiology referral (Tr. 302).

On December 22, 2006, the cardiology referral came back inconclusive because plaintiff failed to reach the target heart rate. The examining physician wrote, "The patient did develop some chest pain symptoms but did not have corresponding EKG changes or echocardiographic changes with this. Therefore, they were not thought to be necessarily ischemic in nature" (Tr. 310).

On January 10, 2007, plaintiff went to Swope Health Northland Clinic complaining about **stomach pain**. The notes state that, **"[Plaintiff] has had multiple workups and they're all negative"** (Tr. 340). She was assessed as having abdominal pain and asthma (controlled).

On January 19, 2007, **Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was overwhelmed by several duties, including her duties as a mother and her job at Taco Bell (Tr. 634). The doctor wrote, "I sympathize with her situation and encouraged her to continue whatever she is doing"** (Tr. 634). Plaintiff appeared alert and oriented. She denied any suicidal or

homicidal ideation.  She had no auditory or visual hallucinations. She appeared mildly anxious but redirectable related to the current situational problem. Plaintiff was assessed as relatively stable.

On February 4, 2007, plaintiff underwent an electrocardiogram. The study showed no evidence of myocardial ischemia (Tr. 316-17).

On February 4, 2007, Dr. Purohit gave plaintiff a GAF of 45-50 (Tr. 635).[6]

On February 5, 2007, plaintiff underwent an MRI of her lumbar spine.  The treating doctor reported no focal disc protrusion or hernia and no cental canal or neural foraminal stenosis, but the doctor recommended sonographic evaluation (Tr. 344; 586).

On February 15, 2007, plaintiff went to Swope Health Northland Clinic complaining about stomach pain.  She was assessed with stomach pain, leg pain (improving), and psychosis.  She was treated and directed to continue her current medications (Tr. 336-37).

On February 19, 2007, J. Stephen Dykstra, D.O., found plaintiff's transabdominal pelvic ultrasound normal (Tr. 342).  He also found her transvaginal pelvic ultrasound to be normal (Tr. 342).

On February 26, 2007, plaintiff went to Swope Health Northland Clinic complaining about leg and stomach pain. She was assessed

---

[6]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

with leg pain, stomach pain, and psychosis.  She was treated and given Vicodin (Tr. 334-35).

On February 26, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff had visual hallucinations in the form of streaks of light at times (Tr.633). **In the subjective part of the report, Dr. Purohit noted that plaintiff had been filing for disability and working had been difficult for her since she could not maintain concentration for a long time and could not handle herself due to anxiety.**  Plaintiff appeared alert and oriented.  She denied any suicidal or homicidal ideation.  She had no auditory or visual hallucinations. She appeared distracted in concentration and had difficulty organizing herself.

On March 6, 2007, plaintiff went to Swope Health Northland Clinic complaining about right-leg pain.  She was assessed with leg pain, psychosis, and chronic obstructive pulmonary disease (COPD). She was treated and given **Vicodin** (Tr. 332-33).

On March 21, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well, although she was having difficulty with anxiety and sleep** (Tr. 632). Plaintiff appeared alert and oriented.  She denied any suicidal or homicidal ideation.  She had no auditory or visual hallucinations. She appeared mildly anxious but redirectable.  Insight and judgment were fair.

On April 2, 2007, Dr. Purohit saw plaintiff for 15 minutes,

27

and reported she was having difficulty with anxiety and sleep (Tr. 630-31). **The doctor recorded in the subjective section of the report that: "The patient is also having difficulty financially and has trouble in getting a job and maintaining the job as her concentration part has been poor and also when she gets into social settings her anxiety symptoms get exacerbated markedly"** (Tr. 630). Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. She was mildly upset and anxious.

On April 26, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that she had gained eight pounds, which could have been caused by medication (Tr. 629). Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. **Plaintiff was depressed secondary to weight gain.** Insight and judgment were fair. Plaintiff had poor concentration and had a hard time organizing and handling the use of conversation.

On May 3, 2007, plaintiff went to Swope Health Northland Clinic complaining about a **sore throat** and head congestion. She was treated and told to **stop smoking** (Tr. 330-31).

On May 14, 2007, plaintiff went to Swope Health Northland Clinic for a follow-up visit. She complained of **leg pain and back pain**. She was assessed with leg pain, back pain, and psychosis.

She was treated and given **Vicodin** (Tr. 328-29).

On May 14, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well**. Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. Her thinking appeared clear and redirectable. Insight and judgment were fair. **Plaintiff reported that she had been off Xanax for three days. The doctor encouraged plaintiff to stay away from addictive drugs, given her history** (Tr. 628).

On May 23, 2007, plaintiff went to St. Luke's Northland Hospital complaining about **pain in a limb resulting from her tripping over boxes** (Tr. 491-98). **Imaging showed that there was no fracture, dislocation or other bony abnormality** (Tr. 498).

On June 3, 2007, plaintiff went to North Kansas City Hospital complaining about **back pain resulting from a fall.** She was given **acetaminophen-oxycodone** and told to follow up with her treating doctor (Tr. 355-60).

On June 11, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well.** Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. Insight and judgment were fair.

On June 21, 2007, plaintiff went to Swope Health Northland

Clinic for a follow-up visit. She was assessed with leg and joint pain, and psychosis. She was treated and given an prescription for **Vicodin** (Tr. 326-27; 657-58).

On June 24, 2007, plaintiff went to North Kansas City Hospital complaining about **feeling shaky, falling, and having back pain**. She was **given medication** and told to follow up with her primary care provider, Swope Northland Health Clinic (Tr. 351-54).

On July 2, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well, although having a spell of irritability** (Tr. 626). Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no hallucinations. In all, plaintiff was calmer and redirectable. Plaintiff **denied any side effects** from her medication.

On July 27, 2007, plaintiff went to the Platte County Health Department Clinic and got a prescription for **Vicodin** (Tr. 580; 582).

On August 9, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having difficulty sleeping and was experiencing anxiety (Tr. 625). The doctor observed that plaintiff was alert and oriented. Plaintiff denied any suicidal or homicidal ideation, and denied any auditory or visual hallucinations. Plaintiff appeared calmer, redirectable, and had fair insight and judgment.

On August 10, 2007, plaintiff went to St. Luke's Northland

Hospital **complaining about back pain radiating down her leg**, resulting from a fall (Tr. 484-90).  Plaintiff said the pain had been ongoing for seven to eight months and complained that she was out of **Percocet** (a narcotic pain reliever, also known as Oxycodone) (Tr. 487).

On August 11, 2007, plaintiff went to St. Luke's Northland Hospital complaining about a backache (Tr. 477-83).

On August 15, 2007, plaintiff went to the Platte County Health Department Clinic and requested **Percocet** 10 instead of Vicodin (Tr. 578).

On August 24, 2007, plaintiff went to the Platte County Health Department Clinic and received refills on her prescriptions including **Vicodin.**  The note states that plaintiff needs an appointment with pain management (Tr. 581).

On August 27, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that **plaintiff was doing relatively well on medications.**  Plaintiff **denied any side effects** for the medications.  The doctor observed that plaintiff was alert and oriented, denied any suicidal or homicidal ideation, denied any auditory or visual hallucinations, and appeared calmer and redirectable; her insight and judgment appeared fair (Tr. 624).

On September 10, 2007, plaintiff went to St. Luke's Northland Hospital complaining of a **backache** (Tr. 470-76).  While at the hospital, plaintiff was given **Dilaudid** (Tr. 475).

On September 13, 2007, a doctor at Platte County Health Department Clinic referred plaintiff to a pain management group for her chronic sciatic/back pain (Tr. 589).

On September 25, 2007, Daniel R. Kloster, M.D., Rockhill Pain Specialists, reported that he met with plaintiff concerning **back pain that resulted from her fall during the past winter** (Tr. 651-53). Plaintiff reported that the pain radiated down her right leg. The doctor gave plaintiff a steroid injection, and planned to continue with a series of three such injections and possibly an MRI (Tr. 652). The doctor provided plaintiff with **Oxycodone** for pain (Tr. 652).

On October 6, 2007, plaintiff went to St. Luke's Northland Hospital complaining about a backache (Tr. 463-69). Plaintiff reported that the **back pain dated back to a fall during the prior winter**, and related that she was in pain management (Tr. 466). While at the hospital, plaintiff was given **morphine** sulfate (Tr. 468).

On October 8, 2007, Dr. Kloster performed a lumbar epidural steroid injection of the L4-5 interspace, after which plaintiff was discharged in good condition (Tr. 649-50).

On October 22, 2007, Dr. Purohit saw plaintiff for 30 minutes, and reported that **she was feeling stressed because her probation officer had been pressuring her to find a job**. The doctor observed that plaintiff appeared alert and oriented, denied any suicidal or

homicidal ideation, denied any auditory or visual hallucination, appeared depressed with appropriate affect, and was mildly withdrawn but redirectable. Plaintiff's insight and judgment were fair (Tr. 622-23).

On October 25, 2007, Dr. Kloster reported that he performed a lumbar epidural steroid injection of the L4-5 interspace, after which plaintiff was discharged in good condition (Tr. 647-48).

On November 20, 2007, Dr. Kloster reported that he refilled plaintiff's prescription for **Oxycodone** and ordered a MRI of her lumbar spine to rule out any surgically correctable causes for her back pain (Tr. 645-46).

On December 6, 2007, plaintiff went to Swope Health Northland Clinic complaining about **back pain** (Tr. 655-56). She was assessed as having lower back pain, asthma, tobacco use disorder, and as being overweight (Tr. 656). She was told to **diet, exercise, and stop smoking** (Tr. 656).

On December 27, 2007, Dr. Kloster reported that **plaintiff's MRI scans were normal although plaintiff continued to complain about back pain radiating down her leg** (Tr. 643-44). **He recommended neuropathic pain medications and stated that opiate medication was unwarranted** (Tr. 643).

On February 10, 2008, plaintiff went to the North Kansas City Hospital due to an **overdose** (Tr. 781-94). Records show plaintiff took "90" hydrocodone tabs (Tr. 783) and she was acquiring multiple

medications with different doctors' names (Tr. 784). The assessment reflect that plaintiff said, **"I was just having fun. I didn't want to kill myself"** (Tr. 795). The records also reflect plaintiff was facing eviction, which was listed as a stressor (Tr. 795). Before being discharged, plaintiff was evaluated by the Behavioral Health Assessment counselor, who did not think plaintiff was a risk to herself (Tr. 782). **The note states, "Currently she has three different doctors writing these prescriptions, which include benzodiazepine, tricyclic, a narcotic, and muscle relaxants"** (Tr. 782). The diagnosis was accidental ingestion (Tr. 782).

On November 24, 2008, Dr. Purohit gave plaintiff a GAF of 45-50 (Tr. 659).[7]

### C. RESIDUAL MENTAL FUNCTIONAL CAPACITY ASSESSMENTS

**1. January 9, 2007 Psychiatric Review Technique**

On January 9, 2007, Keith Allen, Ph.D., performed a psychiatric review technique on plaintiff (Tr. 282-92). Dr. Allen found the following disorders: affective disorder; anxiety-related disorder; and substance addiction disorder (Tr. 282). On degree of limitation, the psychologist found mild restriction on daily

---

[7]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

living; mild restriction on social functioning; moderate restriction on concentration, persistence, and pace; and no restriction based on episodes of decompensation (Tr. 290).

**2.  January 9, 2007 Mental Residual Functional Capacity Assessment**

On January 9, 2007, Keith Allen, Ph.D., completed a mental residual functional capacity assessment on plaintiff (Tr. 296-98). In that assessment, the doctor found that plaintiff was either not significantly impaired or only moderately limited on understanding and memory, sustained concentration and persistence, social interaction, and adaption.  Dr. Allen concluded that, "Based on the above, [plaintiff] may have difficulty with more demanding activities at times, but appears capable of understanding and performing less demanding tasks with treatment compliance and abstinence" (Tr. 298).

**3.  May 9, 2007, Mental Residual Functional Capacity Assessment**

On May 9, 2007, Dr. Purohit completed a mental residual functional assessment on plaintiff (Tr. 319-22).  Dr. Purohit is plaintiff's treating psychiatrist (Tr. 322).  The doctor found plaintiff was either markedly or extremely limited on: ability to understand and remember very short and simple instructions; ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to maintain ordinary routine; ability to work in coordination with others; ability to

35

make simple work-like related decisions; ability to complete normal workaday and workweek without interruptions from psychological symptoms; ability to interact with others appropriately; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism; ability to get along with coworkers; ability to maintain socially appropriate behavior and neatness; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and to take appropriate precautions; ability to travel in unfamiliar places and use public transportation; and ability to set realistic goals or make plans independently of others (Tr. 319-20). In support of these opinions, the doctor wrote: "Patient has significant difficulty in handling self, chronic mood d/o [disorder], anxiety and get[s] disoriented in performing daily duties, get[s] distracted easily and having hard time organizing self" (Tr. 320). The doctor also concluded that plaintiff's use of alcohol and controlled substances had not affected her impairments; in other words, plaintiff would still be as impaired if she stopped using alcohol and other drugs (Tr. 321).

### D. *SUMMARY OF TESTIMONY*

During the hearing, plaintiff testified; Janice Hastert, a vocational expert, also testified at the request of the ALJ.

### 1. **Plaintiff's testimony.**

Plaintiff testified that she was 38 years old at the time of

the hearing and was married (Tr. 25). Plaintiff reported that she has three children (Tr. 26). The children are ages 13, 18, and 20 (Tr. 34). The thirteen-year-old child lives with a friend of her parents; the eighteen-year-old child lives with plaintiff's mother (Tr. 34). Plaintiff reported that she does not see her thirteen-year-old child very often, and basically "gave her to her, because I just couldn't, I wasn't raising her right, me being depressed all the time and staying in my bedroom, and I used to like to cook, and I don't even cook anymore" (Tr. 36). Plaintiff explained that she and the child would get into physical fights (Tr. 36).

Plaintiff stated that she has a GED, and can read and write (Tr. 26).

Plaintiff was questioned about her earnings record and she conceded that, other than 1999 and 2000, she did not work full time for a period of more than three months (Tr. 26-27). Plaintiff explained that she tried to work but was too depressed and experienced anxiety attacks (Tr. 27). For the period between 1988 and 2006, plaintiff reported that she had about 50 jobs (Tr. 33). She quit these jobs because she was uncomfortable being around people and was depressed (Tr. 34).

Plaintiff testified that she has suffered three convictions for DWI, and is currently on probation. The probationary period was extended to three years to allow plaintiff to pay off a $267.00 fine (Tr. 27). Plaintiff also reported serving ten days for her

last DWI (Tr. 28). Plaintiff has been tested for alcohol and drug use during her probation, and has never failed the tests (Tr. 28). Plaintiff reported that she has not used alcohol since her last DWI in September of 2005 (Tr. 30).

Plaintiff testified that she takes prescription narcotics from Swope Parkway Northland in Riverside, Missouri (Tr. 31). Plaintiff denied any knowledge of her doctors opining that she had been engaged in drug-seeking behavior (Tr. 31). Plaintiff reported that her narcotics are prescribed to deal with a sciatic pinched nerve in her back and leg (Tr. 31).

When questioned about a medical entry showing that a doctor in December of 2007 at Rockhill Pain Clinic said that her opiate medications were not warranted, plaintiff replied "No, he just gave me Nortriptyline" (depression drug) (Tr. 32). Plaintiff said that she continued to get narcotic medications from her regular physician (Tr. 32).

Plaintiff explained that her narcotic medication is used to control the pain she experiences as a result of an injury she had to her back and leg when she fell in the snow (Tr. 36). This is what caused plaintiff to be referred to a pain specialist (Tr. 36).

Plaintiff testified that she experiences side effects from Thorazine (anti-psychotic drug); that is, if she fails to take her dose, she hears and sees things (Tr. 35). Her other medications do not cause adverse side effects (Tr. 35).

Plaintiff lives off the income generated by her husband and supplemented by Medicaid (Tr. 28-29; 35).

Plaintiff reported that her disabling illnesses include depression, bipolar disorder, and anxiety (Tr. 29). Plaintiff testified that her anxiety prevents her from working because she cannot get motivated enough to get out of bed (Tr. 33; 35). Plaintiff said she has been receiving treatment for these conditions from Tri-County for five years (Tr. 29).

Plaintiff said that she does not drive and does not possess a driver's license (Tr. 32). Plaintiff's driving license was suspended in 2005 although she is eligible to apply for another by simply paying the fee and taking the test (Tr. 33).

**2. Vocational expert testimony.**

Janice Hastert, a vocational expert testified at the ALJ's request (Tr. 37-40). Ms. Hastert testified that plaintiff has had one relevant occupation as a waitress, which is classified as light work, an SVP three, and semiskilled (Tr. 37).

The vocational expert was asked to assume the following hypothetical person: an individual of plaintiff's age, education, and work history, with a limitation to perform medium exertional work with occasional stooping, climbing, crouching, crawling, and the like, and simple routine work, without involving the public, and only superficial interaction with coworkers and supervisors (Tr. 37).

With those limitations, the vocational expert opined that plaintiff's past work was not available (Tr. 37). However, other available positions exist including a trimmer, twisting machine operator, and a wire coating machine operator (Tr. 37-38).

In the light exertional level with all other factors remaining the same, the vocational expert testified that the following positions exist: injection machine operator; blade groover; and riveting machine operator (Tr. 38).

In the sedentary level with all other factors remaining the sem, the vocational expert testified that the following positions are available: optical goods assembler; stringer machine operator; and electronics assembler (Tr. 38).

The vocational expert acknowledged that if the hypothetical person had difficulties with social interaction, there would be no positions available (Tr. 38). Furthermore, if the hypothetical person had marked difficulties with concentration, persistence, and pace, there would be no available positions (Tr. 38). If the hypothetical person had to miss work two or more days a month, no positions would be available (Tr. 38-39). If the hypothetical person had to take extra breaks on average of an hour a day, no positions would be available (Tr. 39).

The vocational expert was asked to review the state evaluation performed by Dr. Keith Allen, who opined that claimant would have difficulties with concentration, persistence, and pace at the

moderate level (Tr. 39). The expert testified that there were no agency rules defining the term "moderate" (Tr. 39).

The vocational expert was then asked about the medical source statement completed by plaintiff's treating psychiatrist opining that plaintiff has moderate limitations in remembering, moderate limitations in carrying out short and simple instructions, moderate limitations in maintaining attention and concentration for extended periods of time, and moderate limitations in the ability to perform within a schedule, maintain regular attendance, and to be punctual (Tr. 39-40). The expert acknowledged that any of these restrictions would preclude work activity (Tr. 40).

### E. FINDINGS OF THE ALJ

The ALJ, Linda L. Sybrant, entered a decision on June 17, 2008, finding that plaintiff was not disabled under the Social Security Act (Tr. 12-22).

The ALJ found that plaintiff met the insured status requirements of the Act through June 30, 2003 (Tr. 14).

The ALJ found that plaintiff had not engaged in substantial work since her alleged onset date (Tr. 14).

The ALJ found plaintiff had the following severe impairments: bipolar disorder; generalized anxiety disorder, schizoaffective disorder; panic disorder with agoraphobia; and a history of alcohol and drug abuse, including abuse of prescription pain medication (Tr. 14).

41

After an exhaustive review of the medical records (Tr. 14-19), the ALJ found that plaintiff did not have an impairment or combination of impairments that met or were the equivalent of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 19).

The ALJ found that plaintiff's residual functional capacity was consistent with the ability to perform work at any exertional level but because of her mental issues, limited plaintiff's potential work to those jobs that involve simple, routine work, and limited exposure to the general public, coworkers, and supervisors (Tr. 20).

The ALJ discredited plaintiff's claim of total disability, writing:

> She has had a significant alcohol problem, having received three DUI convictions and being on probation currently for one of them. When the undersigned asked her about her alcohol use, the claimant testified that she had not consumed alcohol for 3 years since about September 2005. Yet, ER records show that on July 3, 2006, she had consumed alcohol. At the hearing, the claimant maintained that she had had no positive UAs while on probation. Yet, when the representative said that he would submit those records in this case, she then changed her testimony and said she had had a positive UA for cocaine 2 years ago. The claimant alleges that she cannot get out of her bedroom, which is apparently why Dr. Purohit assessed agoraphobia. As seen above, however, the claimant has not had problems leaving her home and going to ERs to get pain medication. The fact that she sought out narcotic pain medication when she did not need it, of course, also undermines her credibility. Finally, her earnings record, showing low and no earnings reflects an individual who is not motivated to work. In short, the objective medical evidence does not support a finding of a disabling condition or conditions and claimant's lack

of credibility further undercuts her claim of being
disabled.

(Tr. 20-21.)

The ALJ concluded that plaintiff was unable to perform her
past relevant work as a waitress (Tr. 21). But, given plaintiff's
age, education, work experience, and her residual functional
capacity, she could perform jobs that exist in significant numbers
in the national economy (Tr. 21). Specifically, the ALJ wrote:

> Considering the claimant's age classification,
> education, work experience, and the above found residual
> functional capacity, there are jobs that exist in
> significant numbers in the national economy that the
> claimant can perform (20 CFR 404.1560(c), 404.1566,
> 416.960(c), and 416.966).
>
> In determining whether a successful adjustment to
> other work can be made, the undersigned must consider the
> claimant's residual functional capacity, age, education,
> and work experience in conjunction with the
> medical-vocational guidelines, 20 CFR Part 404, Subpart
> P, Appendix 2. If the claimant can perform all or
> substantially all of the exertional demands at a given
> level of exertion, the medical-vocational rules direct a
> conclusion of either "disabled" or "not disabled"
> depending upon the claimant's specific vocational profile
> (SSR 83-11). When the claimant cannot perform
> substantially all of the exertional demands of work at a
> given level of exertion and/or has non-exertional
> limitations, the medical-vocational rules are used as a
> framework for decision making unless there is a rule that
> directs a conclusion of "disabled" without considering
> the additional exertional and/or non-exertional
> limitations (SSRs 83-12 and 83-14). If the claimant has
> solely non-exertional limitations, section 204.00 in the
> medical-vocational guidelines provides a framework for
> decision making (SSR 85-15).
>
> If the claimant had the residual functional capacity
> to perform the full range work, a finding of "not
> disabled" would be directed by medical-vocational rule
> 202.21. The claimant's ability to perform all or

substantially all of the requirements of work, however, is impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for a hypothetical individual with the claimant's same age classification, education, work experience, and above found residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as trimmer (medium, unskilled 859.684-066); twisting machine operator (medium, unskilled 619.485-014); wire coating machine operator (medium, unskilled 501.485-010); injection mold machine tender (light, unskilled 556.685-038); blade groover (light unskilled 705.582-010); and riveting machine operator (light, unskilled 699.685- 030). The vocational expert testified that 470 trimmer jobs exist statewide (Missouri) and 23,000 nationwide; 915 machine operators exist statewide and 43,000 nationwide; 620 wire coating machine operators exist statewide and 41,000 nationwide; 520 injection mold machine tender jobs exist statewide and 78,000 nationwide; 300 blade groover jobs exist statewide and 15,000 nationwide; and 240 riveting machine operator jobs exist statewide and 22,000 nationwide.

Pursuant to SSR 00-4p, the vocational expert reported that her testimony was consistent with the information contained in the Dictionary of Occupational Titles (DOT) and its companion publications, the Selected Characteristics of Occupations.

The undersigned concludes the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 21-22.)

In discounting the opinion of plaintiff's treating psychiatrist, the ALJ wrote:

The opinions of Dr. Purohit have been carefully considered. His findings of marked and extreme limitations are given little weight. He opined that the

claimant has had the mostly marked and extreme limitations he assessed her with since age 16 (9F/2)-that is, since 1987. According to the records, however, Dr. Purohit did not start treating her until 2002. Assessing her with disabling limitations back age 16 can only be based on the claimant's subjective allegations and raises questions as to how much of the psychiatrist's assessment is simply based on claimant's subjective reporting. Moreover, in 2003. Dr. Purohit encouraged the claimant to get involved with vocational rehabilitation (17F/42), and in 2004, he provided a GAF score of 50-60. Encouraging involvement with vocational rehabilitation undermines his opinion that she is unable to work, and a GAF score of 50-60 is inconsistent with the marked and extreme limitations assessed by Dr. Purohit in the checklist form. In 2005, Dr. Purohit lowered the claimant's GAF score to 45 to 50, apparently based on her complaints of anxiety. There are no treatment records in 2006 from the psychiatrist, and in 2007, as in other years, his assessments appear to be based on the situational problems noted by Dr. Allen - legal problems, financial problems, pressure from a probation officer, and the like rather than on significant psychological difficulties. His reports that the claimant had fair insight and judgment and was alert and oriented; albeit with some problems with concentration and organization, simply does not support or explain the very limited functional abilities he assesses on May 9, 2007.

(Tr. 17).

On the issue of pain, the ALJ found that it was not a disabling condition and wrote:

> In addition to mental health problems, claimant alleges that she has physical pain, including significant low back and shoulder pain. Questions have been raised about these assertions and objective medical evidence does not support a disabling condition. On December 27, 2007, Dr. Daniel Kloster with Rockhill Pain Specialists noted that he had reviewed her MRI scans and they were essentially normal. "I do not believe opiate medication is warranted with her normal study. She understood this." (15F/6) A review of the records reflects that the claimant successfully obtained narcotic medications over the years even though not warranted.

> In 2005, claimant made the following visits to emergency

45

rooms and obtained narcotic pain medications: July 27, 2005, North Kansas City Hospital (NKCH), complaint of abdominal pain, received Vicodin and a prescription for Darvocet (11F/107); and July 30, 2005, NKCH, complaint of right upper quadrant pain, received Demerol, morphine and a prescription for Vicodin (11F/89-99). On December 29,2005, the claimant told Dr. Carla Ball that she had had severe right upper quadrant abdominal pain for two weeks. She received a prescription of Vicodin. (1F/17)

In 2006, claimant obtained, or tried to obtain, narcotic pain medications as follows: January 24, 2006, from Dr. Carla Ball, for abdominal pain, prescription of Vicodin ("No more pain medication until seen and evaluated.") (1F/16); February 18,2006, Saint Luke's Northland ER, complaint of abscess, lanced and drained, received Lortab (12F/100); March 17,2006, NKCH ER, complaint of tooth pain, received Vicodin, and directed to follow up with a dentist (11F/71-78); March 19,2006, St. Luke's ER, complaint of tooth pain, received Dilaudid and Vicodin (12F/89-97); March 21, 2006, Dr. Carla Ball, complaint of tooth pain, received prescription for Vicodin (1F/15); April 14,2006, Dr. Carla Ball, complaint of contusions from fight, received prescription for Vicodin (1F/14); May 7, 2006, St. Luke's ER, complaint of sore throat, received Lortab (12F/82-86); June 21,2006, St. Luke's ER, patient called and asking for more pain script and was told no, "Drug seeking" (12F/60); June 28, 2006, Dr. Carla Ball, complaint of abdominal pain, received prescription for Vicodin (1F/10); July 3 and 4,2006, NKCH ER, fell down intoxicated at home, received prescription for Vicodin (11F/40-58); July 7, 2006, St. Luke's ER, complaint of pain from earlier fall, wants larger doses of Vicodin (12F/46-50); July 16, 2006, NKCH ER, complaint of cough and trouble breathing, received Vicodin (11F/26-29); July 17,2006, NKCH ER, complaint of chest pain with earlier fall, received a prescription for Percocet (11F/20-24); July 18,2006, Dr. Carla Ball, advised not to take codeine or hydrocodone or oxycodone dm, to developing allergy (1F/7); July 23, 2006, NKCH ER, complaint of pain from broken ribs, narcotics not provided (11F/14-16); July 27, 2006, Dr. Carla Ball, complaint of persistent pain in ribs, "discussion with her regarding use of narcotics and as she was going to ER repeatedly and her to get narcotics don't feel comfortable writing them again" (1F/6); July 30, 2006, Liberty Hospital ER, complaint of right sided pain, received Percocet (2F/18-22); August 6, 2006, Liberty Hospital ER, complaint of right sided pain, out of pain medication prescribed from last ER visit, received Z-Pak, but no narcotic pain medication (2F/10-16); August 17,2006, Dr. Carla Bell, complaint of rib

pain, "She has been to the ER again with this a pain and she wasn't given any pain med because I had called after finding out she was getting meds from numerous sources. I told her she needs to get any pain meds from me only and she needs to get very few," received Vicodin (1F/5); October 2, 2006, Dr. Carla Bell, complaint of cough and hurt tail bone, received Vicodin (no more med after this refill) (1F/3); October 5, 2006, Dr. Carla Ball, complaint of right shoulder pain, pain is severe and nothing helps but Vicodin, "Avoid the Vicodin as she is using it for too many reasons" (1F/2); November 15, 2006, "Angela is here today because she is very concerned about possibility of going to jail. She says she on parole for DUI and has tested positive for cocaine, but absolutely denies usage. She has to be retested tomorrow and she wants to get tested independently today to confirm negativety. She also has wrist pain. . . . She wants something for pain. Her behavior has been erratic in the office, it probably would be a good idea to confirm negativity on a drug screen" tested negative for cocaine, marijuana and narcotics, received Ibuprofen (8F/2-7); November 24, 2006, Liberty Hospital ER, complaint of shoulder pain, flagged for narcotic use. (2F/2-9)

In 2007, the following occurred with regard to narcotic pain medication: 2/15/07, Swope Health Northland Clinic, complaint of abdominal pain, received prescription for Percocet (10F/15); May 14,2007, Swope Parkway, "patient states that she needs refills of her pain meds - for her leg and back pain," received prescription for Vicodin (10F/6-7); May 23, 2007, St. Luke's ER, complaint of pain after tripping, received Lortab (12F/31-32); June 3, 2007, North Kansas City Hospital ER, complaint of back pain, received morphine and prescription for Percocet (11F/11-12); June 21,2007, Swope Parkway, complaint of leg pain, received prescription for Vicodin (10F/4-5); July 27, 2007, Dr. David Dyck, complaint of sciatic nerve pain, received a Vicodin shot and prescription (13F/9-10, 8); August 10,2007, Dr. David Dyck, "patient called in. Says she has appointment on 8/24 and wanted to move it up sooner. . . . says she is on Vicodin and needs more due to pain . . . . if she is in that much pain, she'll need to go to the ER." (13F/l7); August 10, 2007, St. Luke's ER, complaint of back and leg pain, patient states out of Percocet, received prescription of Percocet (l2F/24-27); August 11, 2007, St. Luke's ER, complaint of back pain, received Percocet (l2F/16-18); August 24, 2007. Dr. David Dyck, received Vicodin with no refills, need appointment with pain management (l3F/8-9); September 10, 2007, St. Luke's ER, complaint of back pain, received Percocet (12F/9-12); September 25,2007, Rockhill Pain Clinic, complaint of low back pain, received

Oxycodone (15F/14-15); October 6, 2007, St. Luke's ER, complaint of back pain, received Percocet (12F/2-4); October 8, 2007, Rockhill Pain Clinic, complaint of back pain, received Oxycodone (l2F/12-13); November 20, 2007, Rockhill Pain Clinic, complaint of back pain, received Oxycodone.

On December 27,2007, Dr. Daniel Kloster of Rockhill Pain Center noted that the MRI study of the claimant's spine was normal and that under the circumstances, opiate medication is not warranted. (l5F/6-7)

(Tr. 17-19).

## V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 at 1322.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

## 1. PRIOR WORK RECORD

Plaintiff's credibility is not supported by her work record. It is clear from her earnings statement that plaintiff has had only a few years between 1985 and 2003, when she earned even modest earnings (Tr. 104).  The medical records also reflect that plaintiff was encouraged to work and seek involvement from educational and vocational rehabilitation resources – a recommendation that she neglected to follow (Tr. 634; 699-700; 701-02; 736).

During the administrative hearing, plaintiff conceded that

49

other than 1999 and 2000, she did not work full time for a period of more than three months (Tr. 26-27). For the period between 1988 and 2006, plaintiff said that she had about 50 jobs, which she quit because she was uncomfortable being around people and was depressed (Tr. 33-34). Plaintiff's explanation for her failure to consistently work during this lengthy period is not supported by the medical records.

## 2. DAILY ACTIVITIES

Plaintiff does not do much of anything according to the administrative record. She has had three children, but has not been and is not responsible for any of them (Tr. 34). She essentially stays at home in bed most of the time (Tr. 36).

The question, of course, is whether this status as "homebound" is dictated by some medical or psychiatric condition, or is a matter of choice by plaintiff.

The medical records are replete with entries dealing with plaintiff's significant travels around the metropolitan area for the purpose of securing controlled substances. The following are just some of the entries dealing with plaintiff's drug-seeking behavior: plaintiff's treating psychiatrist, Parimal Purohit, M.D., wrote on January 18, 2002 - early on in his treating of plaintiff - that she "appear[ed] gaming too at times and demanding Clonazepam"[8]

---

[8]Clonazepam is used to treat seizures and symptoms of panic disorder.

(Tr. 752); on May 29, 2003, Dr. Purohit observed some manipulation on plaintiff's part when she claimed her medication had been stolen (Tr. 705-06); on May 8, 2006, the notes from St. Luke's Northland Hospital relate that plaintiff's claims of pain were out of proportion to the medical findings (Tr. 538); on June 21, 2006, St. Luke's Northland Hospital recorded plaintiff as "drug seeking" (Tr. 521); on June 28, 2006, plaintiff was given Vicodin at Encompass Medical Center and the notes state, "no more narcotics" (Tr. 222); on July 27, 2006, plaintiff returned to Encompass Medical Center and the doctor observed that she was repeatedly going to the emergency room for narcotics (Tr. 218); on August 17, 2006, plaintiff went to Encompass Medical Center emergency room for pain medication and the note states that she was getting pain medication for numerous sources (Tr. 217); and on February 10, 2008, plaintiff went to the North Kansas City Hospital, was admitted as an overdose, and explained that she was just having fun, and not trying to kill herself (Tr. 795).

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff stated during her administrative hearing that she has been and continues to be unable to work due to depression, bipolar disorder, and anxiety (Tr. 27, 29). She represented that she cannot get motivated enough to get out of bed (Tr. 33, 35).

While there is little evidence to contradict plaintiff's representation that she seldom leaves her bed other than to visit

51

medical providers, there is substantial evidence in the record that this is largely a matter of choice, not the result of symptom from her depression, bipolar disorder, or anxiety.

Plaintiff's treating psychiatrist, Parimal Purohit, M.D., consistently described plaintiff's depression and anxiety as "situational," that is, caused by her lack of a job, her resulting financial problems, or her legal difficulties (Tr. 630; 634; 674-75; 699-700).

#### 4.  PRECIPITATING AND AGGRAVATING FACTORS

As discussed above, plaintiff's treating psychiatrist stated in the medical records that plaintiff's depression and anxiety appear to be "situational" or triggered by her lack of work, her financial problems, and her legal difficulties.  The only logical inference to be drawn from these medical entries is that plaintiff's depression and anxiety would likely improve if she worked and stayed out of trouble.

#### 5.  DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Plaintiff testified that, other than experiencing side effects when she forgets to take a drug, her medications have no adverse side effects (Tr. 35).  This is borne out in the medical records (Tr. 505-05; 668; 682-83).

#### 6.  FUNCTIONAL RESTRICTIONS

Plaintiff alleges that her depression, bipolar condition, and anxiety prevent her from performing any meaningful work (Tr. 27;

34).  There was no allegation at the administrative hearing that plaintiff's physical conditions and pain are preventing her from working.  Indeed, such an argument would clearly fail in any event based on plaintiff's medical records, which show a patient repeatedly complaining about pain from a back injury that has thus far defied identification or explanation by medical science.  A fair reading of plaintiff's medical history leads one to the irrefutable conclusion that she has feigned the back and other injuries to "game" the system - as her treating psychiatrist once described it (Tr. 752).

We are left with plaintiff's alleged psychiatric restrictions.  There are two psychiatric residual functional capacity assessments in the administrative records: one performed on January 9, 2009, by Keith Allen, Ph.D., and a second performed on May 9, 2007, by Parimal Purohit, M.D.

Dr. Allen found the following disorders: affective disorders, anxiety-related disorders, and substance addiction disorders (Tr. 282).  On degree of limitation, the psychologist found mild restriction on daily living; mild restriction on social functioning; moderate restriction on concentration, persistence, and pace; and no restriction based on episodes of decompensation (Tr. 290).  Dr. Allen concluded that, "Based on the above, [plaintiff] may have difficulty with more demanding activities at times, but appears capable of understanding and performing less

demanding tasks with treatment compliance and abstinence" (Tr. 298).

Dr. Purohit is plaintiff's treating psychiatrist (Tr. 322). He found plaintiff was either markedly or extremely limited on the: ability to understand and remember very short and simple instructions; ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to maintain ordinary routine; ability to work in coordination with others; ability to make simple work-like related decisions; ability to complete normal workaday and workweek without interruptions from psychological symptoms; ability to interact with others appropriately; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism; ability to get along with coworkers; ability to maintain socially appropriate behavior and neatness; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and to take appropriate precautions; ability to travel in unfamiliar places and use public transportation; and ability to set realistic goals or make plans independently of others (Tr. 319-20). In support of these opinions, the doctor wrote: "Patient has significant difficulty in handling self, chronic mood d/o [disorder], anxiety and get[s] disoriented in performing daily duties, get[s] distracted easily

and having hard time organizing self" (Tr. 320). The doctor also concluded that plaintiff's use of alcohol and controlled substances have not affected her impairments; in other words, plaintiff would still be as impaired if she stopped using alcohol and other drugs (Tr. 321).

Normally, one would defer to a treating physician but here the ALJ did not because Dr. Purohit's conclusions are not supported by the medical records. Summarizing, Dr. Purohit's contemporaneous entries in the medical records show plaintiff to be "alert and oriented," without "any suicidal or homicidal ideation," without any "auditory or visual hallucinations," and, although at times experiencing situational depression or anxiety, "redirectable." These entries stand in stark contrast to the May 9, 2007, assessment in which Dr. Purohit opined that plaintiff was either markedly or extremely limited.

In addition, the doctor's medical entries around the time of his assessment do not support his conclusions:

> On April 2, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was having difficulty with anxiety and sleep (Tr. 630-31). The doctor recorded in the subjective section of the report that: "The patient is also having difficulty financially and has trouble in getting a job and maintaining the job as her concentration part has been poor and also when she gets into social settings her anxiety symptoms get exacerbated markedly" (Tr. 630). Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. She was mildly upset and anxious.

> On April 26, 2007, Dr. Purohit saw plaintiff for 15

55

minutes, and reported that plaintiff had gained eight pounds, which could have been caused by her medication (Tr. 629). Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. Plaintiff was depressed secondary to weight gain. Insight and judgment were fair. Plaintiff had poor concentration and hard time organizing, even handling the use of conversation.

On May 14, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing relatively well. Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. She appeared clear thinking and redirectable. Insight and judgment were fair. Plaintiff reported that she had been off Xanax for three days. The doctor encouraged plaintiff to stay away from addictive drugs, given her history (Tr. 628).

On June 11, 2007, Dr. Purohit saw plaintiff for 15 minutes, and reported that plaintiff was doing relatively well. Plaintiff appeared alert and oriented. She denied any suicidal or homicidal ideation. She had no auditory or visual hallucinations. Insight and judgment were fair.

Dr. Purohit recorded in the medical records the following Global Assessment Functions for plaintiff:

May 10, 2004, GAF 50-60[9] (Tr. 684);

November 4, 2005, GAF 45-50[10] (Tr. 637);

January 12, 2006, GAF 45-50 (Tr. 636);

---

[9]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[10]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

January 19, 2007, GAF 45-50 (Tr. 635); and

January 24, 2008, GAF 45-50 (Tr. 659).

As with the doctor's mental residual functional capacity assessment, there are few entries medical records that support the Global Functional Assessments of 45-50. There are no entries dealing with suicidal ideation, no entries reflecting severe obsessional rituals, no entries establishing that plaintiff engaged in frequent criminal acts, no entries supporting the conclusion that plaintiff was without friends, and no entries supporting the conclusion that plaintiff was *unable* to keep a job.

The ALJ's conclusion that plaintiff is unwilling to work is supported by substantial evidence.

### B.   CREDIBILITY CONCLUSION

Based on the above analysis, I find that the ALJ properly evaluated plaintiff's credibility.

### VI. OPINION OF THE TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Parimal Purohit, M.D., plaintiff's treating psychiatrist.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v.

Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

1. **Length of treatment relationship.** The records of plaintiff's visits to Dr. Purohit span from December 14, 2001, through November 24, 2008, a period of approximately seven years.

2. **Frequency of examinations.** The records reflect that plaintiff saw Dr. Purohit on about 40 occasions - generally either every month or every other month - during the period between 2001 and 2008. The vast majority of the examinations lasted only 15 minutes. A handful of visits lasted 30 minutes.

3. **Nature and extent of treatment relationship.** Based on the entries in the medical records, the doctor-patient treatment relationship was confined to a subjective report by plaintiff about her condition and any problems she was experiencing; observations made by the doctor as to whether plaintiff appeared anxious or depressed; a boilerplate narrative that plaintiff denied any suicidal or homicidal ideation, denied any auditory or visual

hallucinations, and was redirectable; an assessment of plaintiff's condition (e.g., alcohol use with anxiety symptoms; anxiety symptoms, side effects of medications; improving); a diagnosis; and a plan that largely focused on plaintiff's medications.

**4.    Supportability by medical signs and laboratory findings.**

The only medical signs that are contained in Dr. Purohit's medical records are the Global Assessment Functions described earlier.   Again, the entries are just numbers without any explanation as to how they were arrived at or what they were based upon.

**5.    Consistency of the opinion with the record as a whole.**

The crux of the problem is this: Dr. Purohit's opinion as to plaintiff's functional restrictions is not consistent with the record as a whole.   Dr. Purohit's own entries fail to support his conclusion that plaintiff is either markedly or extremely limited in her functional capacity.   Instead, they reflect plaintiff's depression and anxiety as situational in that they are brought on by her lack of work, her resulting financial woes, and her legal problems.   Furthermore, the balance of the medical records paint plaintiff as a highly manipulative person essentially feigning illness and pain in an relentless effort to score controlled substances.

**6.    Specialization of the doctor.** Dr. Purohit is a psychiatrist.

Based on all of the above, I find that the ALJ did not err in failing to give controlling weight to the opinion of Dr. Purohit. A physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the Commissioner's decision. <u>Loving v. Dept. of Health and Human Services</u>, 16 F.3d 967, 971 (8th Cir. 1994); <u>Browning v. Sullivan</u>, 958 F.2d 817, 823 (8th Cir. 1992).

### VII.  PLAINTIFF'S PHYSICAL PAIN

Plaintiff argues that the ALJ erred by not finding that she had a severe physical disability based on the findings by two clinics that plaintiff suffers from physical pain (Plaintiff's Brief at 11-12).

Although plaintiff testified about her alleged back problem and pain at the administrative hearing (Tr. 31; 32; 36), she did not include it in her list of disabling conditions.  Plaintiff testified that her disabling conditions include depression, bipolar disorder, and anxiety (Tr. 29).  She explained that anxiety prevents her from working because she cannot get motivated enough to get out of bed (Tr. 33; 35).

My review of the medical records confirms that plaintiff has used the alleged back problem (and other complaints such as tooth ache, stomach pain, pain in the buttocks and groin, chest and shoulder pain, tail-bone pain, and wrist pain) as a ploy to secure controlled substances.  The records are replete with references to

60

back pain and drug-seeking behavior (Tr. 214; 215; 217; 218; 222; 510; 521; 538; 643; 705-06; 752).

Clearly, plaintiff's alleged back problem has nothing to do with disability. Therefore the ALJ did not err by discounting this alleged condition and plaintiff's claim of disabling pain.

## VIII.   CONCLUSIONS

Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 16, 2010